# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                )
POLAR CORPORATION,                              )
                                                )
      Plaintiff,                               )
                                                )
      v.                                       )     **Civil Action No.**
                                                )     **11-40021-FDS**
PEPSICO, INC. and THE CONCENTRATE               )
MANUFACTURING CO. OF IRELAND,                   )
                                                )
      Defendants.                              )
_____)

## MEMORANDUM AND ORDER ON
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

**SAYLOR, J.**

      This is an action for trademark infringement.  Plaintiff Polar Corporation is an independent bottler based in Worcester, Massachusetts, that sells bottled water, soda, and other non-alcoholic beverages under the "POLAR" brand.  The Concentrate Manufacturing Company of Ireland ("CMCI") is a wholly-owned subsidiary of PepsiCo, Inc.  The dispute involves defendants' introduction and sale of frozen slush drinks under the name "POLAR SHOCK."

      In March and April 2010, CMCI began filing U.S. trademark applications for a family of POLAR SHOCK marks for non-carbonated, non-alcoholic, frozen, flavored beverages.  During the summer of 2010, PepsiCo and CMCI began distributing beverages under the POLAR SHOCK family of marks.  Polar has sued for federal trademark infringement in violation of 15 U.S.C. § 1114(1) and false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a).  Pending before the Court is its motion for a preliminary injunction against defendants' use of the POLAR SHOCK family of marks.

For the reasons stated in this opinion, the Court will grant plaintiff's motion for a preliminary injunction.

## I.    <u>Background</u>

The following facts are taken from the parties' filings and are undisputed except where indicated otherwise.

### A.    <u>The Plaintiff</u>

Polar Corporation is the nation's largest independent bottler of non-alcoholic beverages. Its main bottling plant is located in Worcester, Massachusetts.  (Compl. ¶ 7).  Polar traces its roots back to 1882, when the J.G. Bieberbach Company bottled seltzers and ginger ale and distributed imported mineral water.  (*Id.*).  Today, Polar employs more than 1,200 personnel throughout New England, New York, the Carolinas, and Florida.  (*Id.*).

Polar currently manufactures and distributes drinking water, iced teas, seltzer waters, various carbonated sodas, and fruit and seltzer blended beverages under the POLAR brand.  (*Id.* ¶ 11, Ex. 5; Crowley Decl. ¶ 2).  These products are sold in bottles, cans, and through fountain services.[1]  Polar also bottles and distributes soft drinks for other companies.  Since 1992, Polar has acquired the rights to manufacture and distribute national soda brands, including 7 Up, A&W Root Beer, Sunkist, and Seagrams.  (Compl. ¶ 8).  Polar also distributes Gatorade and Izze under contracts with PepsiCo.

---

[1] POLAR brand seltzer water flavors include black cherry, blueberry, cranberry lime, Georgia peach, lemon, lime, mandarin orange, pomegranate, raspberry lime, ruby red grapefruit, triple berry, and vanilla. (Crowley Decl. ¶ 3).  Some POLAR brand carbonated sodas are also fruit-flavored, including ORANGE DRY, raspberry lime, strawberry, grape, pineapple, and pomegranate.  (*Id.* ¶ 4).

Polar sold more than $70 million of POLAR brand products in 2010.  POLAR beverages are sold principally in New England, the Mid-Atlantic states, and the Southeast.  (Compl. ¶ 18; Crowley Decl. ¶ 5).  New York and Massachusetts are the largest markets for POLAR brand products, but the southeastern United States is a growing market.  (Compl. ¶ 20; Crowley Decl. ¶ 5).  Although the majority of POLAR products are sold in grocery stores, they are also sold in more than 1,000 convenience stores, gas station outlets, "mom and pop" stores, and "destination" venues, such as ski areas, zoos, and theaters.  (Crowley Decl. ¶ 14).  In 2010, sales of more than $4.5 million, or 6% of total POLAR sales, were made in convenience stores.  (*Id.* ¶ 10).  Polar also sells carbonated beverages through fountain services at locations such as Wachusett Mountain Ski Area, The New England Aquarium, ADCARE Hospital, and restaurants in New York and New England.  (Compl. ¶ 19; Crowley Decl. ¶ 14).

Over the last five years, Polar has spent, on average, several million dollars per year advertising POLAR beverages to consumers.  (Compl. ¶ 21).  In 2010, Polar spent $7.2 million in advertising.  (Crowley Decl. ¶ 16).  Polar advertises in magazines and newspapers, including *The Boston Globe*.  (Compl. ¶ 22, Ex. 6; Crowley Decl. ¶ 17).  It also advertises on billboards, on delivery trucks, through the Internet, through event sponsorships and charitable relations, and through Val-Pak coupon promotions.  (Compl. ¶ 22).  Its products are advertised on radio and television throughout New England and New York.  (*Id.*).  Sometimes, as in radio advertising, Polar advertises its products using just the word "Polar," with no particular design or mascot.

3

(Crowley Decl. ¶ 18).  Polar markets its beverages to a wide variety of consumers, including males between the ages of 16 and 22.  (*Id.* ¶ 12).[2]

Polar has used the trademark "POLAR" since 1902 in connection with its carbonated soft drinks, bottled water, seltzer water, and other beverages.  (Compl. ¶ 12, Exs. 1-4).  Polar owns a federal trademark registration on the principal register for POLAR (stylized) in Class 32, which was filed in 1910 and registered in 1911.  (Compl., Ex. 1 (U.S. Trademark Reg. No. 0084705)).  Polar also owns federal registrations for POLAR PURE and POLAR with Design, both on the principal register.  (Compl., Exs. 2-3 (U.S. Trademark Reg. Nos. 1,177,537; 2,743,648)).  Polar filed a federal trademark application on June 18, 2010, for POLAR (words only) in class 32 on the principal register, which disclosed a date of first use of January 1, 1902, and which was published for opposition on November 16, 2010.  (Compl., Ex. 4).  Polar claims to own state trademark registrations for POLAR covering soft drinks and carbonated beverages in sixteen states.[3]

### B.    The Defendants and the POLAR SHOCK Family of Marks

PepsiCo markets and sells both carbonated beverages and frozen slush beverages.  Some of its beverages are in direct competition with Polar's beverage products.  Its beverages are sold to convenience stores, supermarkets, and fountain services through authorized distributors and bottlers.  PepsiCo markets carbonated beverages under many brands, including PEPSI, MOUNTAIN DEW, SLICE, MUG ROOT BEER, and MTN DEW.  PepsiCo also manufactures,

---

[2] In the summer of 2010, Polar sponsored a "Fizzically Fit Summer Tour" as part of its marketing efforts to young adults, including males between the ages of 12 and 22.  (Crowley Decl. ¶ 13).

[3] The states are Connecticut, Delaware, Florida, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, South Carolina, Utah, Vermont, Virginia, and West Virginia. (Compl. ¶ 17).

markets, and sells frozen slush drinks and concentrates under the marks MOUNTAIN DEW BLUE SHOCK and MOUNTAIN DEW BLUE SHOCK FREEZE.[4]

CMCI is a wholly-owned subsidiary of PepsiCo. During March and April 2010, CMCI filed registration applications with the United States Patent and Trademark Office for six marks in the POLAR SHOCK family.[5] Each of these applications was filed for the principal register and was published for opposition in early August 2010. (Compl., Exs. 9-15). Polar opposed each of the six applications.[6]

CMCI did not abandon the POLAR SHOCK trademark applications, and the first POLAR SHOCK dispensing machine was installed on June 29, 2010, in Florida, with consumer sales starting almost immediately thereafter. (Hr'g. Tr. at 41). Defendants began selling POLAR SHOCK products in New England in August 2010, but began to add large numbers of machines during the fall of 2010. (Ex. W, Docket No. 36, at 2-6). The first POLAR SHOCK machines in Massachusetts were installed at Gillette Stadium in Foxboro around August 11, 2010. (Harter Supp. Decl. ¶ 2).

_____

[4] PepsiCo states that it has a *bona fide* intent to manufacture and sell soft drinks under the mark MTN DEW BLUE SHOCK, but denies that its federal trademark application for MTN DEW BLUE SHOCK covers both soft drinks and semi-frozen beverages.

[5] On March 17, 2010, CMCI filed an application to register the mark POLARSHOCK for non-carbonated, non-alcoholic, frozen, flavored beverages. On April 2, 2010, CMCI filed an application to register POLAR SHOCK SERIOUS STRAWBERRY. On April 14, 2010, CMCI filed applications for POLAR SHOCK RAZZBERRY and POLAR SHOCK. On April 22, 2010, CMCI filed an application for POLAR SHOCK ORANGE FROST. On April 28, 2010, CMCI filed an application for POLAR SHOCK and Design. Each of these applications were filed for Class 32.

[6] On June 14, 2010, Polar's attorney sent a letter to defendants demanding that CMCI abandon its POLAR SHOCK applications and that defendants not adopt the POLAR SHOCK marks. On June 23, 2010, defendants replied and advised that they did not intend to abandon the applications because there was no likelihood of confusion from their use or registration of the marks.

CMCI filed four more trademark applications at the PTO on November 3, 2010.[7]  In November 2010, Polar's President and CEO became aware of a "tweet" dated October 2, 2010, offering POLAR SHOCK for sale at Agganis Arena at Boston University.  (Crowley Decl. ¶ 6).  On November 16, 2010, Polar wrote another letter to defendants requesting that they reconsider their refusal to abandon the POLAR SHOCK applications and rebrand their products.  CMCI has not abandoned its applications and defendants have not ceased using the marks.  Defendants acknowledge their awareness that Polar uses POLAR in its marks and had certain PTO registrations using the word "Polar" in connection with the sale of beverages.

As of March 7, 2011, there were almost 8,000 POLAR SHOCK machines in operation nationwide, about 8% of which were located in New England or New York.  (Harter Supp. Decl. ¶ 1).  PepsiCo had made capital investments exceeding $15 million for the installation of the POLAR SHOCK machines as of that date.  (*Id.* ¶ 10; Hr'g. Tr. at 51).  Defendants acknowledge that POLAR SHOCK frozen slush products are or will be marketed in 16 states, including Massachusetts, Maine, New Hampshire, Connecticut, and New York.[8]  POLAR SHOCK retailers in Massachusetts include Agganis Arena, food service companies, entertainment venues, restaurants, grocery stores, and convenience stores.  (Ex. W, at 5-6).  About 1% of all POLAR SHOCK products are distributed at grocery stores.  (Harter Supp. Decl. ¶ 5).  POLAR SHOCK frozen slush beverages are sold primarily at convenience stores and quick-serve restaurants.

---

[7] CMCI filed for the marks POLAR SHOCK POTENT PEACH, POLAR SHOCK VIVA MARGARITA, POLAR SHOCK CHILLA VANILLA, and POLAR SHOCK MO MOCHA, all in Class 32.

[8]  The other states are Delaware, Florida, Maryland, Minnesota, Ohio, New Jersey, North Carolina, South Carolina, South Dakota, Tennessee, and Virginia.

The overwhelming majority (95%) of Polar's sales, or almost $12 million sales in a recent twelve-month period, took place in grocery stores. (Ex. X, Docket No. 34-2). Defendants' submissions indicate that Polar made almost 270,000 sales at convenience stores in a recent twelve-month period, or 2.2.% of their total sales by volume over that period.[9] (*Id.*). In at least one case, POLAR beverages and POLAR SHOCK beverages are currently sold in close proximity in the same store in New England. (Crowley Decl. ¶ 11).

Although PepsiCo and CMCI have no national advertising budget for POLAR SHOCK, the POLAR SHOCK marks are displayed on frozen slush machines, cups, and point-of-purchase materials. PepsiCo also markets point-of-sale materials for POLAR SHOCK beverages on its website.

On January 25, 2011, Polar filed suit against defendants for federal trademark infringement in violation of 15 U.S.C. § 1114(1) and false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a). Polar requested preliminary and permanent injunctions to prevent defendants from using the ten POLAR SHOCK marks or any confusingly similar marks anywhere in the United States. That same day, Polar filed the present motion for preliminary injunction. The Court heard arguments by the parties on March 11, 2011.

## II.   Analysis

The Lanham Act empowers federal courts to enjoin activity that infringes federally registered trademarks. *See* 15 U.S.C. § 1116. To obtain a preliminary injunction in a trademark case, a party must show (1) a substantial likelihood of success on the merits, (2) a significant risk

---

[9] Defendants' data for Polar Corp. sales volume breaks sales down into three categories: grocery store, drug store, and convenience store. (Ex. X). Nothing in the record indicates which of these categories, if any, would include the entertainment venues and restaurants that Polar claims as channels of distribution.

of irreparable harm, (3) that the balance of equities is in its favor, and (4) that granting the injunction will not adversely affect the public interest.  *See TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 82 F.3d 542, 544 (1st Cir. 1996).  "The *sine qua non* of this four-part inquiry is likelihood of success on the merits."  *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).  This factor is especially important when the preliminary injunction is based on a trademark claim, because the other factors tend to follow determinations regarding the likelihood of consumer confusion.  *See Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 115 (1st Cir. 2006).

## A.      Likelihood of Success on the Merits

Plaintiff contends that it is likely to succeed on the merits of its claims of trademark infringement and false designation of origin and unfair competition under the Lanham Act.  With respect to both claims, plaintiff must prove (1) the mark is entitled to trademark protection, and (2) use by another in commerce that is likely to cause confusion as to the source or sponsorship of the goods or services.  *See Borinquen Biscuit*, 443 F.3d at 116.

## 1.      Protectability of the Marks

Whether a mark is afforded trademark protection depends upon whether it is capable of functioning as a source-identifier of goods.  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992).  This quality is called "distinctiveness."  *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 12 n.9 (1st Cir. 2008).  Courts evaluate distinctiveness by placing a given mark onto a spectrum of categories that includes generic, descriptive, suggestive, arbitrary, and fanciful marks.  *Two Pesos*, 505 U.S. at 768.

Suggestive marks require "imagination, thought and perception to reach a conclusion as to the nature of goods." *Boston Duck Tours*, 531 F.3d at 12 n.10 (identifying COPPERTONE for suntan lotion as an example of a suggestive mark "because it hints at the nature" of the product). Like arbitrary and fanciful marks, suggestive marks are considered inherently distinctive because they have the capacity to serve a source-identifying function upon first use. *Id.* at 13. The term "polar" is suggestive in relation to beverages because it requires an inferential step to reach a conclusion as to the nature of the goods. Defendants do not contest that the term "polar" is suggestive as to beverages. (*See* Def. Br. at 9 ("Plaintiff's claimed POLAR marks, while perhaps suggestive, are commercial weak and entitled only to very narrow scope of protection.")). As the parties do not dispute that the term "polar" is suggestive and therefore inherently distinctive with respect to beverages, it is eligible for trademark protection. Similarly, the Polar logo, which incorporates the word "polar" among other distinctive features, is entitled to protection as a distinctive mark.

As a second basis for the protectability of its mark, plaintiff points out that it owns federal trademark registrations for POLAR (stylized), POLAR PURE, and POLAR (plus wave design), and a federal trademark application for POLAR (words only), all in Class 32. (Compl. ¶ 13, Exs. 1-4). Plaintiff also maintains that it has common law rights to the term POLAR for soft drinks, and that it has state trademark registrations for the term POLAR for soft drinks in 15 states. (*Id.* ¶¶ 12, 17). Plaintiff contends that the distinctiveness of the first three registrations is now incontestable, and that the registrations constitute *prima facie* evidence of its ownership of protectable marks. (Compl. ¶ 13; Pl. Br. at 5). Defendants have not disputed that federal registration of a mark is *prima facie* evidence of validity and of the registrant's ownership of the

mark and exclusive right to use the mark in commerce throughout the United States.  (Def. Br. at 10).  Because plaintiff owns distinctive marks for non-alcoholic beverages, including POLAR (stylized), POLAR PURE, and POLAR plus wave design, its marks are eligible for trademark protection under the Lanham Act.

### 2.        Likelihood of Consumer Confusion

The key element in any trademark infringement action is likelihood of consumer confusion. *See Purolator, Inc. v. EFRA Distribs., Inc.*, 687 F.2d 554, 559 (1st Cir. 1982); *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 486-87 (1st Cir. 1981).  Likelihood of confusion is a question of fact.  *Purolator*, 687 F.2d at 559.  Trademark infringement requires more than a theoretical possibility of confusion, but a substantial likelihood of "confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." *Boston Duck Tours*, 531 F.3d at 12 (internal quotation marks omitted).

Plaintiff contends that consumers are "likely to believe that the drinks offered under Defendants' POLAR SHOCK family of marks are produced by or are authorized, endorsed, related to or sponsored by Polar."  (Compl. ¶ 91).  Likelihood of confusion as to sponsorship or endorsement is actionable under the Lanham Act.  *See* 15 U.S.C. § 1125(a)(1)(A) (imposing liability for using a mark in a manner likely to cause confusion "as to the origin, sponsorship, or approval" of goods by another person); *TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 927 F. Supp. 528, 534-35 (D. Mass. 1996) (observing that the key element in any infringement action is likelihood of confusion as to source or sponsorship of the goods).  Courts are generally in agreement that likelihood of confusion extends beyond simply source confusion to include confusion as to sponsorship, affiliation, endorsement, or connection.  4 Thomas McCarthy,

10

*McCarthy on Trademarks and Unfair Competition* § 24:6 (4th ed. 2008).

Courts assess the likelihood of confusion by consulting the following factors:  (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the juxtaposition of their advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) defendant's intent in adopting the mark; and (8) the strength of plaintiff's mark.  *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir. 1983).  In weighing these criteria, "[n]o one factor is necessarily determinative, but each must be considered" by the court in assessing the likelihood of confusion "on the whole."  *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 817 (1st Cir. 1987); *Pignons*, 657 F.2d at 487.  All factors "must be evaluated in context, [and] any meaningful inquiry into the likelihood of confusion necessarily must replicate the circumstances in which the ordinary consumer actually confronts (or probably will confront) the conflicting mark."  *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196, 201 (1st Cir. 1996).

### a.  <u>Similarity of the Marks</u>

When determining the similarity of two marks, a court should consider the "sight, sound and meaning" of the marks.  *Volkswagenwerk*, 814 F.2d at 817.  The ultimate determination of whether the marks are similar should be based on "the total effect of the designation, rather than a comparison of individual features."  *Pignons*, 657 F.2d at 487.  "[Marks] are to be compared as ordinary purchasers of soft drinks would compare them, that is, on the basis of similarities in their general appearance both in construction and in over-all impression on the eye."  *Coca-Cola Co. v. Snow Crest Beverages, Inc.*, 162 F.2d 280, 284 (1st Cir. 1947).  When evaluating marks

11

containing words, the type of letters used (script or block), the color and composition of the background upon which they appear, and the spelling of the words, are important considerations. *Id.* at 283-84.

Plaintiff contends that the POLAR SHOCK word marks are confusingly similar to the POLAR mark, as POLAR is the sole element or the dominant component of both marks. Defendants counter that the parties' products are sold only in connection with their respective logos, but that their logo does not evoke the same commercial impression as plaintiff's marks. Because plaintiff alleges trademark infringement of its word marks and its logos, the Court will consider the parties' word and logo marks separately.

### (1)      The Word Marks

Plaintiff contends that the POLAR SHOCK marks are "virtually identical" to the POLAR trademarks, with only the addition of the word "SHOCK." (Compl. ¶ 54). In plaintiff's view, the term "Polar" is the dominant feature of defendants' marks because it is the first word that will be read by consumers. Plaintiff points to defendants' MOUNTAIN DEW BLUE SHOCK marks, which combine a famous brand with the word "SHOCK" to create an impression of affiliation or sponsorship, and contends that defendants' POLAR SHOCK marks create a similar impression of affiliation with the POLAR brand. (Compl. ¶ 77).

Defendants counter that the similarity of the word marks should only be considered "as used on labels," and that plaintiff identifies itself not with the POLAR mark, but with the POLAR BEVERAGES, POLAR SELTZER, POLAR COLA, and POLAR and Polar Bear Logos. (Def. Br. at 12 n.9, 13 n.10 (citing Compl. ¶ 21, Ex. 5; Emerson Decl. ¶¶ 15-16, Exs. O-P)). Defendants also maintain that plaintiff's analogy between MOUNTAIN DEW BLUE SHOCK and

POLAR SHOCK is without basis because PepsiCo did not expand the BLUE SHOCK line, because POLAR is weaker than the MOUNTAIN DEW brand, and because BLUE SHOCK is a flavor while POLAR SHOCK is a brand name.

Defendants have not disputed the similarity of the parties' word marks.  Instead, they cite evidence of widespread use of the parties' respective logos.  But both the POLAR marks and the POLAR SHOCK marks are used to identify the parties' products separately from their respective logos.[10]  A comparison of only the logos would not suffice to determine whether ordinary consumers would reasonably be confused by the similarity of the marks.

When used without the accompanying logo, defendants' POLAR SHOCK marks are substantially similar to plaintiff's registered and unregistered marks.  (*Compare* Compl., Exs. 1-4, *with* Compl., Ex. 19).  For beverages, the first word or syllable of a product brand is often used to identify that product.  (*See* Crowley Decl. ¶ 1 (citing "Coke" and "Pepsi" as examples)).[11]  Consider a typical consumer, perhaps one in defendants' targeted 16-to-22-year-old male demographic.  If he follows that pattern for identifying beverages, he is likely to speak of a "Polar" or perhaps a "Polar slushie," without adding the term "Shock." The use of the world "Polar" to refer to defendants' product—which, by sound alone, is indistinguishable from

---

[10] The POLAR marks are used without the Polar logo in radio advertisements and press releases.  (*See* Compl. ¶¶ 21-25; Crowley Decl. ¶¶ 13, 18).  Polar products are also identified by the POLAR marks independent of Polar's logo in Internet advertisements.  (*See* Crowley Decl. Ex. 2 (Polar web page listing "Polar Products," and "Polar Flavors," without the Polar logo)).  Defendants' POLAR SHOCK products are similarly advertised under POLAR SHOCK marks independent of the Shock logo.  The POLAR SHOCK products were advertised at Boston University's Agganis Arena in a "tweet" using only the word mark.  (*See* Crowley Decl. ¶ 6; *id.* Ex. 3).  The Agganis Arena web site similarly included "Polar Shock" in its list of available beverages while including the Shock logo in another location on the same web page.  (Compl., Ex. 19).

[11] That is not, of course, the only way in which beverages are popularly identified; for example, consumers do not typically refer to Mountain Dew soda as "Mountain."  But neither is it true that consumers always use the full formal name of a product; thus, it is common for consumers to use "Bud" for Budweiser beer, or "Chevy" for Chevrolet automobiles.

plaintiff's products—is likely to confuse the listener. Anyone hearing the term "Polar" to refer to a commercially-available beverage can be expected to associate the product with plaintiff's beverages; indeed, it is improbable that the person would distinguish between "polar" beverages made by plaintiff and "polar" beverages made by defendants.[12]

Where there is only one word in a brand, that word is the brand identity. Thus, the mark POLAR is Polar's brand identity. (Crowley Decl. ¶ 1, Ex. 2 (Polar web page listing "Polar Products," and "Polar Flavors," without the Polar logo)). Defendants' incorporation of plaintiff's entire mark as the first word in its own mark renders the two marks confusingly similar. *See Best Flavors, Inc. v. Mystic River Brewing Co.*, 886 F. Supp. 908, 914 (D. Me. 1995) (explaining that the similarity of defendant's MYSTIC SEAPORT marks to plaintiff's MISTIC and ROYAL MISTIC marks supported finding a likelihood of confusion).

Defendants' reliance on *Bear Republic Brewing Co. v. Central City Brewing Co.*, 716 F. Supp. 2d 134, 147 (D. Mass. 2010), a case involving a dispute between the brands "RED RACER" and "RED ROCKET," is misplaced. There, the court compared the total effect of the RED RACER label with that of a RED ROCKET label. *Id.* It found that there was "no commonality between the fonts or label designs," and that "the overall appearance of the label designs overcame the similarity of having a common first word." *Id.* By contrast, there is evidence in this matter that the marks are used independently of their product labels, as in defendants' Twitter advertisements. And consumers can be expected to refer to the product in word-of-mouth communication. Defendants here did not merely incorporate a descriptive term

---

[12] Defendants do not, at this point, advertise POLAR SHOCK on the radio. Should such advertising occur, the similarity of the marks (and thus the likelihood of confusion) would be heightened, as no visual cues would distinguish the marks.

such as "RED," or the latter half of a two-word mark (such as "RACER" from the mark "SPEED

RACER").  Instead, the POLAR SHOCK word marks incorporate plaintiff's entire, registered,

distinctive mark, rendering the POLAR SHOCK word marks similar as a whole to plaintiff's

POLAR marks.  This factor accordingly weighs in favor of finding a likelihood of confusion.

### (2)     The Logo Marks

Plaintiff contends that the word POLAR is "inevitably an integral component in the

commercial impression" that the POLAR SHOCK marks make on consumers.  (Compl. ¶¶ 56-

57).  Defendants argue that although the parties' word marks contain the same first word, visual

differences in their logos "neutralize" this factor when the logos are used to identify the products.

(Def. Br. at 11 (citing *Bear Republic*, 716 F. Supp. 2d at 147; *Peoples Fed. Sav. Bank v.*

*People's United Bank*, 750 F. Supp. 2d 217, 225 (D. Mass. 2010))).

The parties have submitted photographs and images of logos used to mark their products.

POLAR beverages are frequently marked by the Polar logo, which includes the word "POLAR"

drawn in thick white lettering with the letters laid out in a slight arch instead of being level with

one another.  (Mot. Ex. A-5; Compl., Exs. 5-7).  The letters stand out against a dark-blue

background shaped like a rectangle, with the two longest ends of the rectangle curved upward in

an arc consistent with the lettering.  (*Id.*).[13]  The ends are outlined by a shade of blue that is lighter

than the rest of the background.  Sitting atop the curved rectangular background is a gold-colored

circle with a dark blue outline.  (*Id.*).  The circle encompasses a stylized white polar bear.  (*Id.*).

The POLAR SHOCK slush machines, cups, and advertising materials submitted by the

parties disclose almost exclusive use of the Shock logo, which appears to be the POLAR SHOCK

---

[13] The background is occasionally green or gold.  (Mot., Ex. A-5; Compl., Exs. 5-7).

and Design mark described in PTO Application No. 85/026,597.[14]   The Shock logo comprises the word "POLAR" on top of the word "SHOCK," with both words drawn in thick white lettering and set against a blue background.   (Compl. ¶ 44(c); Mot., Exs. A-8, A-26).   The font appears similar to that in the POLAR mark, except that some letters (especially the "O" in "POLAR") have sharp, triangular embellishments.   (*See* Compl. ¶ 44(c)).   The "Shock" lettering is slightly larger than the "Polar" lettering and follows an arc of similar appearance to that in the Polar logo, although the letters in the word "Polar" are level with one another.   (*See id.*).   The white lettering in the Shock logo stands out against a predominantly blue background with four other colors filling smaller segments of the background.   (*See id.*).   The entire background has a dark-blue outline and is surrounded by several shades of blue in a "burst" pattern.   (*See id.*).   The blue background on the POLAR SHOCK mark forms a symmetrical trapezoid with each edge of the trapezoid having a generally concave structure.   (*See id.*).   Each edge of the trapezoid is outlined in black and is punctuated by sharp protrusions.   (*See id.*).

The relationship between word marks and logos was addressed in *Peoples Federal Savings Bank v. People's United Bank*, 750 F. Supp. 2d 217, 225 (D. Mass. 2010).   The court held that although the marks contained the same dominant word, the presence of the word "United" and differences between the logos neutralized this similarity.   *Id.*   The Peoples Federal logo used a green color scheme with a yellow horizontal line separating "Peoples" from "Federal Savings Bank."   *Id.*   By contrast, the People's United logo used a red-and-blue color scheme where the words "Peoples" and "United" were the same size and font, encircled by a red orbit

---

[14] Plaintiffs submitted a printout from Agganis Arena web site in that  lists a variety of "fountain sodas," and then also lists as beverages:  "Aquafina, Snapple, Nantucket Nectars & Polar Shock."  (Compl., Ex. 19).  The logo was located on the same page but on the opposite side as the fountain sodas and beverages.  (*Id.*).

icon. *Id.* The court explained that those differences "undoubtedly help customers distinguish between the two banks, thus decreasing the chance of confusion." *Id.*

The parties' logos in *Peoples* contained markedly different color schemes and geometries. Here, however, the logos share some significant similarities in color scheme, geometry, and typeface. *See Coca-Cola Co.*, 162 F.2d at 283-84 (in comparing product labels, the type of letters used (script or block), the color and composition of the background upon which they appear, and the spelling of the words, are important considerations). Although the Shock logo has subtle coloring differences from the Polar logo, the overall color scheme and geometry of the Shock logo are similar to those of the Polar logo. The Shock logo has a predominantly blue appearance similar to that of the Polar logo. This similarity is heightened by the common white color and similar typeface of the lettering. While the Shock logo's burst pattern and sharp protrusions provide some contrast with Polar's smooth curves, the generally curved edges of the trapezoidal background in the Shock logo emulate the Polar logo. Although the differences between the two logos are pronounced enough for a reasonable consumer to distinguish between the two logos, the designs are similar enough that a substantial number of consumers would reasonably believe that POLAR SHOCK was somehow sponsored by or associated with the POLAR brand.

In *Bear Republic*, the court compared the total effect of the RED RACER beer label with that of a RED ROCKET beer. It held that although the coupling of the word "red" with a word conveying movement and speed was common to both marks, this similarity did not overcome the difference in the overall appearance of the marks' names and designs, because there was "no commonality between the fonts or label designs." *Bear Republic*, 716 F. Supp. 2d at 147. The

17

court pointed out that the defendant's label differed from that of the plaintiff because it featured images of a "pin-up" girl on a bicycle instead of a "space race" era rocket ship. *Id.* at 146. In the present case, however, defendants used a distinctive word that served as plaintiff's trademark for more than a century, and adopted a logo with a somewhat similar coloring and geometric design. The alterations in color and geometry here do not approach the degree of difference in mood and design that existed between the pin-up girl and the space rocket in *Bear Republic*.

Defendant is correct that altering the general appearance of a logo can help avoid creating a likelihood of confusion. In *Best Flavors*, the Court held that defendant's MYSTIC SEAPORT mark was confusingly similar to plaintiff's MISTIC and ROYAL MISTIC marks because the label emphasized the word "Mystic" over the word "Seaport" in type-size, typeface, positioning, and label coloring, and because the word "Mystic" was confusingly similar to "Mistic." *Best Flavors*, 886 F. Supp. at 913-14. In comparison, where the defendant's label provided equal prominence to each word of the phrase "MYSTIC SEAPORT PALE ALE," the court held that the differences between the marks weighed against finding a likelihood of confusion. *Id.* at 914, 918.

Although the Shock logo does not emphasize the word "POLAR" over the word "SHOCK," the addition of the slightly larger word "shock" has less significance in this case than the addition of the word "seaport" had in *Best Flavors*. "Mystic Seaport" had been the defendant's name since World War II and was an internationally known and respected maritime museum. *Best Flavors*, 886 F. Supp. at 911. Although Mystic Seaport was a junior user in the context of non-alcoholic beverages by a period of about three years, its general use of its "MYSTIC SEAPORT" brand pre-dated plaintiff's use by decades. *Id.* at 910-11. Here, the similarity of "POLAR" to "POLAR SHOCK" is even stronger than the similarity between

18

"MISTIC" and "MYSTIC SEAPORT PALE ALE."  The distinctiveness of plaintiff's mark, its

prominent position in defendants' logo, and the similarities in color scheme, geometry, and

typeface, all indicate a reasonably high degree of similarity between the parties' marks. This factor

weighs in favor of finding a likelihood of confusion.

### b.      Similarity of the Products

Trademark protection may extend beyond the exact product to include related products or

services.  *See, e.g.*, *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 28 (1st Cir. 1989) (owner of

Boston Marathon mark could enjoin use of mark on shirts and running apparel); *Volkswagenwerk*,

814 F.2d at 817 (car sales and car repairs were related products); *Best Flavors*, 886 F. Supp. at

912 ("all chilled nonalcoholic beverages, other than perhaps milk, are closely related for many

beverage purchasing decisions"); *Calamari Fisheries, Inc. v. The Village Catch, Inc.*, 698 F.

Supp. 994, 1010 (D. Mass. 1988) (Sicilian-style seafood restaurant and generic seafood restaurant

were similar services); *Perfection Fence Corp. v. Fiber Composites, LLC*, 2005 WL 353017, at

*3 (D. Mass. Feb. 10, 2005) (fencing and decking products were related).  *But see Unleashed*

*Doggie Day Care, LLC v. Petco Animal Supplies Stores, Inc.*, 2010 WL 5207599, at *6 (D.

Mass. Dec. 16, 2010) (pet supply store not sufficiently related to pet day care and grooming

service because neither party expressed desire to expand into the others' field and "[h]ypothetical

similarity of services does not establish likelihood of confusion").  An owner of a trademark is

afforded "'protection against use of its mark on any product or service which would reasonably be

thought by the buying public to have come from the same source.'"  *Anheuser-Busch, Inc. v.*

*Caught-on-Bleu, Inc.*, 288 F. Supp. 2d 105, 118 (D.N.H. 2003) (quoting 4 McCarthy § 24:6).

Plaintiff contends that defendants' non-carbonated, non-alcoholic, frozen flavored beverages are "highly related" to the soft drinks and other beverages identified by the POLAR mark, and that they are "directly competitive" with its POLAR-branded beverages as non-alcoholic beverage products.  (Compl. ¶ 59; Pl. Br. at 10).  Defendants disagree, contending that the products sold under the POLAR SHOCK marks are dissimilar both in scope and in the type of beverages sold under the POLAR marks.  In defendants' view, the dissimilarities are that (1) POLAR SHOCK products are dispensed from stand-alone machines, not sold in bottles; (2) POLAR SHOCK products are "slush drinks" that are brightly-colored frozen beverages intended for immediate consumption, which are distinguishable in overall look and feel from other beverages; (3) plaintiff's products, unlike POLAR SHOCK products, can be purchased, stored, and consumed at a later date; and (4) slush drinks are typically consumed in the afternoon as a snack, but carbonated soda beverages are typically consumed with a meal.

The parties' products are sufficiently similar that some substantial percentage of the purchasing public would reasonably believe that the products came from the same source.  Although slush beverages are "distinguishable in overall look and feel" from sodas and flavored water, that fact alone is not dispositive.  The question is not whether consumers would confuse a slush drink with a soda, but whether they would reasonably conclude that a soda manufacturer and distributor would also produce slush drinks.[15]  Defendants' own experience producing both carbonated sodas and slush drinks demonstrates the reasonableness of such a conclusion.  This inference is also supported by PepsiCo's marketing of frozen slush drinks under the MOUNTAIN

---

[15] Although significant regulatory and manufacturing differences distinguish soft drinks generally from alcoholic beverages, no comparable distinction can be drawn between the parties' beverages under these circumstances.  *See Best Flavors*, 886 F. Supp. at 914.

DEW BLUE SHOCK mark.  Because some substantial percentage of reasonable consumers would conclude that a soda producer such as plaintiff would also produce slush drinks, the similarity of the parties' products weighs in favor of finding a likelihood of consumer confusion.

### c.    Strength of Plaintiff's Marks

"Under the Lanham Act strong marks enjoy the greatest protection against infringement." *Winship Green Nursing Ctr.*, 103 F.3d at 206 (finding service mark "robust" because it had been registered and widely promoted for over thirty years).  Suggestive marks are generally considered strong marks.  *Calamari Fisheries*, 698 F. Supp. at 1013.  In the First Circuit, however, courts analyze the strength of a mark by focusing on its commercial strength instead of its theoretical classification.  *See Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 41 (1st Cir. 2006).  Several factors may be relevant to ascertaining the strength of a trademark, including the length of time the mark has been used, the trademark holder's renown in the industry, the potency of the mark in the product field (as measured by the number of similar registered marks), and the trademark holder's efforts to promote and protect the mark.  *See Borinquen Biscuit*, 443 F.3d at 121 (citing *Boston Athletic Ass'n*, 867 F.2d at 32).

Plaintiff contends that its POLAR marks are strong because they are incontestably distinctive and because they have been consistently used in commerce for over a century. Plaintiff submits that its annual sales revenues of over $70 million, the millions of dollars spent on advertising, and extensive consumer recognition (particularly in New England) further confirm the strength of its POLAR mark.

Defendants contend that despite plaintiff's longstanding use and promotion of its marks, the strength of these marks is overpowered by third-party registrations and uses.  They have

identified several subsisting registrations on the federal register or like uses in commerce. These registrations and uses, in defendants' view, demonstrate that the field is crowded such that consumers are accustomed to distinguishing between marks for beverages containing the term "Polar."

Plaintiff agrees that third-party use of similar marks on similar goods can demonstrate that a mark is weak, but argues that it is use in commerce, not mere registration, that weakens the commercial strength of a mark. Under plaintiff's theory, consumers can only be conditioned to distinguish between similar marks if the marks are used in commerce in competition with its own POLAR marks. Because the marks cited by defendants are not analogous to its products, do not compete with them, or are otherwise sufficiently distinguishable, plaintiff maintains that the third-party uses do not diminish the strength of its marks.

Of the marks with alleged third-party registrations or uses, five registered marks have been cancelled.[16]   Four more have been abandoned.[17]   Two marks have cancellations pending; one of those marks is sold only in Colorado,[18] and the other is sold only on gallon-size water jugs in one grocery store chain in New York City.[19]   One is used in conjunction with another famous brand.[20] Five are used in connection with less analogous products, such as alcoholic beverages, energy

---

[16] Those marks include POLAR POUCH (2 registrations), POLAR and Bear Design, POLAR BLENDS, POLAR KRUSH GET KOOL WITH THE KRUSH and Design, and POLAR WAVE (3 registrations).

[17] Those marks include POLAR PROTEINS, POLAR VIDA, POLAR ICE, and POLAR BLAST.

[18] That mark is POLAR BEAR (2 registrations), and identifies a chilled, coffee-based drink.

[19] That mark is POLAR BEAR NATURAL SPRING WATER SODIUM-FREE NON-CARBONATED and Design. This use of the mark tends to weaken the POLAR mark, at least in some segment of the market in New York.

[20] That mark is HAWAIIAN PUNCH POLAR BLAST.

drinks, milk products, or powdered drink mixes.[21] One identifies products sold only in Nevada and California, where plaintiff's beverages are not sold.[22] (*See* Hr'g. Tr. at 10, 53).

Two marks may arguably diminish the strength of plaintiff's marks. Cadberry Schwepps has used the unregistered term "Polar Purple Shiver" as a flavor for its SLUSH PUPPIE brand and logo for nearly eight years. As the flavor term "Polar" is used in conjunction with a well-known brand name, however, it cannot be expected to have significantly weakened plaintiff's marks. The Handy Corporation has also filed an intent-to-use application for POLAR BLUE NATURAL ARTESIAN WATER and Design, which would brand water beverages. Plaintiff has requested that Handy withdraw the application. But because the application is based on an intent to use, rather than preexisting use in commerce, the pending mark cannot have appreciably weakened plaintiff's marks.

Despite some use of the word "Polar" in third-party marks, therefore, plaintiff's marks remain relatively strong, at least in New England and New York. Plaintiff's marks are weaker in the other states in which its products are sold, and substantially weaker in those states where it sells no products at all. The registrations and uses cited by defendants, however, do weigh against the strength of plaintiff's marks to an extent because they indicate some level of diminished potency and failure to protect the mark. *See Sun Banks of Fla. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316, 317 n.10 (5th Cir. Jul. 1981) (finding existing use of the term "sun" in eight financial institutions in Florida weighed against finding strength in plaintiff's mark).

---

[21] Those marks are POLAR FX ENERGY (energy drink), POLAR ICE VODKA and Design (alcoholic beverage), MALTA POLAR (ale-style malt beverage), POLAR VANILLA (milk product), and POLAR POWDER (powdered drink mix). To the extent that the MALTA POLAR mark relates to a non-alcoholic, ale-like malt beverage, it may diminish the strength of plaintiff's marks.

[22] That mark is POLAR CHILL.

The evidence of limited third-party use is not, however, sufficient to counteract the extensive history of use and the millions of dollars in sales and advertising that fortified plaintiff's marks, at least in the northeastern United States.

Most significantly, the character of the marks and the products sold under them are, as general matter, sufficiently distinguishable from the parties' marks and products to be of only limited countervailing weight.  First, marks that were never used to identify products sold in commerce are essentially irrelevant for these purposes.  Second, alcoholic beverages, milk products, and powdered drink mixes are sufficiently distinguishable from plaintiff's products such that third-party use for these products is of only limited relevance.  *See Anheuser-Busch*, 288 F. Supp. 2d at 125 (third-party registrations for unrelated products do not diminish the strength of an otherwise strong mark); *Best Flavors*, 886 F. Supp. at 914 (distinguishing alcoholic beverages from nonalcoholic beverages for likelihood of confusion analysis).  Third, the inclusion of the term "Polar" in marks preceded by a third party's own well-known brand (such as Hawaiian Punch) is of limited relevance to an analysis of whether defendants' marks, which do not contain any famous or well-known brand, are likely to create confusion with plaintiff's brand.[23]  Fourth, third-party uses that are limited to markets (such as California and Nevada) where plaintiff's products are not sold are irrelevant to defendants' theory that consumers are conditioned to distinguish between the two marks.[24]

---

[23] Plaintiff entered into an agreement with the owner of the mark that requires it to use the brand "Hawaiian Punch" in front of the term "Polar Blast."  (*See* Hr'g. Tr. at 9).

[24]  Although the existence of confusingly similar marks in California and Nevada is relevant to whether plaintiff protects its marks (a separate factor in the strength analysis), it does not support defendants' theory of consumers' enhanced ability to distinguish between the parties' mark.  The Court notes that plaintiff did submit evidence of multiple negotiations and PTO proceedings that demonstrates some degree of policing the use of its marks.  (Reply Br., Ex. A ¶¶ 3-11).

In short, the Court finds that in addition to their theoretical distinctiveness, plaintiff's marks are commercially strong despite the limited third-party uses and registrations. Because of longer periods of use, larger sales, and fewer relevant third-party uses, plaintiff's marks are strongest in New York and New England. They are less strong, or relatively weak, in other markets. The commercial strength of plaintiff's marks weighs generally in favor of finding a likelihood of confusion.

> **d.      Relationship Between the Parties' Channels of Trade, Juxtaposition of Advertising Practices, and Classes of Prospective Purchasers**

The next three factors—the relationship between the parties' channels of trade, the juxtaposition of their advertising practices, and the classes of their prospective purchasers—are normally considered together. *Pignons*, 657 F.2d at 488. Plaintiff contends the POLAR SHOCK beverages are marketed and sold to the same or overlapping classes of customers through overlapping channels of trade using similar advertising practices. (Compl. ¶¶ 60, 82-84). In plaintiff's view, both POLAR and POLAR SHOCK beverages are inexpensive impulse purchases sold for similar prices and competing for the same consumers. (*Id.* ¶¶ 87-88 (citing Ex. 26)). Defendants disagree, observing that POLAR SHOCK beverages are distributed through different channels of trade than POLAR beverages, with little overlap. They further note that the parties market their products to different groups of consumers using different marketing themes. Specifically, defendants argue that only 2.2% of plaintiff's sales occurred in convenience stores where the vast majority of POLAR SHOCK beverages are sold. Defendants also argue that POLAR SHOCK targets young men between the ages of 16 and 22, whereas POLAR targets an

older audience.  However, despite defendants' contentions, the products substantially overlap in their channels of trade, advertising, and classes of prospective purchasers.

Defendants' principal argument against finding similarity of channels of trade is that the majority of POLAR beverages are sold in grocery stores, while the majority of POLAR SHOCK beverages are sold in convenience stores.  According to defendants' submissions, 95% of Polar's sales in a recent twelve-month period took place in grocery stores.  Defendants acknowledge that some of their products directly compete with plaintiff's products and that about 1% of all POLAR SHOCK products are distributed at grocery stores.  (Harter Supp. Decl. ¶ 5).  Lacking figures for POLAR SHOCK products' total sales volume, there is reduced value in comparing 1% of POLAR SHOCK's sales to 95% of Polar's sales.  Defendants contend that they have already sold millions of beverages in the months since they began POLAR SHOCK distribution.  (Def. Br. at 17).  If those millions of sales amount to 5 million beverages, for example, then 1% of those beverages would amount to 50,000 beverages.  Even without relying on this hypothetical total sales figure, a significant degree of overlap in channels of trade would be established.

A substantial number of sales overlap in convenience stores.  Defendants' own submissions establish that 270,000 sales of POLAR brand products occurred in convenience stores in a recent twelve-month period.  In 2010, more than $4.5 million in sales, representing 6% of total POLAR sales dollars, were made in convenience stores.  (Crowley Decl. ¶ 10).  In at least one case, POLAR beverages and POLAR SHOCK beverages are sold in close proximity in the same store in New England.  (*Id.* ¶ 11).  In addition to convenience stores and grocery stores, POLAR beverages are competing with POLAR SHOCK beverages for placement at entertainment venues and through the food services industry.  (Crowley Decl. ¶ 14; Ex. W).

26

Thus, at the very least, hundreds of thousands of POLAR sales worth millions of dollars each year move through the exact same channels of trade as the POLAR SHOCK products.

Defendants contend that the parties' advertising methods and consumer targets differ because POLAR SHOCK products are marketed in an "edgy" fashion to appeal to young males while POLAR beverages appeal to "mature adults."  (Def. Br. at 16, 17).  Although defendants may have targeted a specific sub-class of consumers, POLAR products are marketed to a wide variety of consumers, including young males between the ages of 16 and 22.  (Crowley Decl. ¶ 12).  Regardless of defendants' alleged focus on a single demographic group, a substantial overlap remains between consumers targeted by POLAR SHOCK and those targeted by Polar.

As for methods of advertising, although defendants currently have no national advertising budget for POLAR SHOCK products, to the extent that defendants advertise their products, they do so in substantial overlap with plaintiff's advertising methods.  Plaintiff advertises through print and broadcast media, as well as through the Internet and event sponsorships.  (Compl. ¶ 22, Ex. 6; Crowley Decl. ¶ 17).  Defendants admit to advertising and marketing POLAR SHOCK products on PepsiCo's web-sites and through point-of-sale materials.  (Ans. ¶¶ 38, 41).  Plaintiff's extensive advertising efforts through a variety of means substantially overlap with the means of promotion currently employed by defendants for the POLAR SHOCK products, as well as the means defendants would likely employ should they decide to begin aggressive promotion of their products.

In sum, the substantial overlap that exists between the parties' channels of trade, their classes of prospective purchasers, and their advertising methods weighs in favor of finding a likelihood of confusion.

e.   **Evidence of Actual Confusion**

The parties agree that there is no proof of actual confusion on the record.  They differ,

however, as to the meaning of this finding.  Plaintiff contends that defendants have not yet begun

extensive distribution of their products and that actual confusion should be stopped before it

begins.  Defendants respond that "thousands" of machines and "millions" of beverages have been

sold throughout the country since the summer of 2010.  (Def. Br. at 17).  Because the products

were sold for seven months in the same geographic markets, defendants maintain that under such

circumstances, "the absence of actual confusion is strong evidence that confusion is unlikely to

occur in the future."  (*Id.* at 16).

"[P]roof of actual confusion is not essential to finding likelihood of confusion." *Borinquen*

*Biscuit*, 443 F.3d at 120.  The absence of evidence of actual confusion is only relevant when the

products have "coexisted on the market for a long period of time."  *Id.* at 121 (finding that market

coexistence lasting one year from the junior user's product proliferation was not long enough to

require evidence of actual confusion); *Pignons*, 657 F.2d at 490 (explaining that market

coexistence without actual confusion for "a substantial period of time" creates a strong

presumption that there is little likelihood of confusion).  Although defendants have distributed

"thousands" of machines since July 2010, less than 8% of these machines are located in New

York and New England, where most POLAR beverages are sold.  (Harter Supp. Decl. ¶ 1).

POLAR SHOCK machines were not distributed in bulk in New England until the fall of 2010, just

a few months before plaintiff filed suit.  (*See* Ex. W).  This short period of time is insufficient to

require evidence of actual confusion to prove likelihood of confusion.  Nonetheless, the absence

of action confusion may weigh in some degree in defendants' favor and against an injunction.

28

#### f.     **Defendants' Intent in Adopting the Marks**

Plaintiff contends that defendants adopted their marks in bad faith because they had actual and constructive notice of plaintiff's marks well before choosing to pursue the POLAR SHOCK marks.  (Pl. Br. at 13).  In evaluating intent, however, courts must distinguish between "a company's knowing decision to risk a law suit and a factual inference that customer confusion is likely."  *Attrezzi*, 436 F.3d at 40.  "[M]ere knowledge of the existence of a competitor's mark is insufficient to prove bad faith."  *NEC Elecs., Inc. v. New England Circuit Sales, Inc.*, 722 F. Supp. 861, 866 (D. Mass. 1989).  "Bad faith requires proof that one party intended to capitalize on the holder's reputation/goodwill and confusion between the marks."  *Unleashed Doggie Day Care*, 2010 WL 5207599, at *7.  The parties' submissions adequately support plaintiff's position that defendants were aware of plaintiff's marks.  But the filings do not indicate that defendants designed their marks to derive benefit from plaintiff's goodwill.  Although finding bad faith would have favored finding a likelihood of confusion, a lack of bad faith, or even good faith, does not disfavor finding a likelihood of confusion.  *Star Fin. Servs., Inc. v. AASTAR Mortg. Corp.*, 89 F.3d 5, 11-12 (1st Cir. 1996).  Thus, this factor is neutral to the likelihood of confusion analysis.

#### g.     **Consideration of the Factors as a Whole**

To recap, the strength of plaintiff's marks, the similarities between the parties' marks and products, and the relationship between their channels of trades, prospective customers, and means of advertising favor finding a likelihood of consumer confusion.  These factors are most compelling in New England and New York, where plaintiff's marks are strongest and where most of its goods are sold.  The remaining factors are neutral with respect to likelihood of confusion under the facts as presently constituted (or, in the case of actual confusion, arguably favor

defendants).  Taken together, these factors demonstrate that there is a substantial likelihood that an appreciable number of reasonably prudent purchasers exercising ordinary care would be confused as to the source or sponsorship of the POLAR SHOCK beverages in New England and New York.  *See Boston Duck Tours*, 531 F.3d at 12.  The likelihood of success is substantially less certain nationwide, as more third-party uses must be considered and the commercial strength of plaintiff's marks diminishes, sometimes considerably.  Thus, plaintiff has demonstrated a likelihood of success on the merits with respect to sales in New England and New York.

### B.   <u>Risk of Irreparable Harm</u>

Effectuating the purpose of the Lanham Act "requires a liberal interpretation of the irreparable injury factor."  *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 14 (1st Cir. 1986).  In the context of trademark litigation, irreparable harm is generally presumed if a plaintiff demonstrates a likelihood of success on the merits.  *See Borinquen Biscuit*, 443 F.3d at 115; *Hypertherm, Inc. v. Precision Prods., Inc.*, 832 F.2d 697, 699-700 (1st Cir. 1987); *Camel Hair*, 799 F.2d at 14.

The Court concludes that the likelihood that customers will be confused as to the source or sponsorship of the POLAR SHOCK beverages supplies a basis for finding irreparable harm.  *See Hypertherm*, 832 F.2d at 700 ("Few harms are more corrosive in the marketplace than the inability of a trademark holder to control the quality of . . . articles thought (erroneously) to derive from it.").  Plaintiff is at risk of continuing and irreparable harm to its protectable trademark interests because it has established a substantial likelihood of success on the merits. Furthermore, the loss of control over its mark, and the threatened devaluation of the strength of the mark, are both examples of irreparable harm facing plaintiff if defendants are permitted to

30

proceed with use of the POLAR SHOCK marks.  *See Attrezzi*, 436 F.3d at 39 (describing

irreparable harm of reverse confusion).

The presumption of irreparable harm from likelihood of confusion may be rebutted by

evidence that plaintiff was aware (or had reason to be aware) of the infringement and did not

bring suit for an unreasonable amount of time.  *Fritz v. Arthur D. Little, Inc.*, 944 F. Supp. 95,

98-99 (D. Mass 1996) (finding unexplained delay of at least two years in bringing infringement

action rebutted presumption of irreparable harm).  In circumstances where a plaintiff's delay is

unreasonable, the court may fairly infer that the plaintiff "'concluded that there was no

infringement but later brought an action because of the strength of commercial competition.'"  *Id.*

(quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 39 (2d Cir. 1995)).

Defendants assert that plaintiff should have known from its receipt of defendants' letter of June

23, 2010, that distribution of POLAR SHOCK beverages had already begun.  (Hr'g. Tr. at 40;

Def. Br. at 18).  Defendants maintain that waiting seven months to seek injunctive relief was an

unreasonable delay.  (*Id.*).[19]

After considering the parties' submissions, the Court concludes that plaintiff did not

unreasonably delay filing the present motion and that the irreparable harm factor weighs in favor

of granting the preliminary injunction.  Defendants' letter did not disclose any present distribution

of the POLAR SHOCK beverages, but only an intention to proceed with plans for future

distribution.  (*See* June 23, 2010 Letter, Docket No. 19-3).  Similarly, defendants' trademark

applications did not demonstrate actual distribution under the accused marks, but merely an intent

---

[19] Defendants' reliance on several cases from the Fifth Circuit regarding unreasonable delay is inapposite because the Fifth Circuit, unlike the First Circuit, does not have a presumption of irreparable harm.  *See H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC*, 2009 WL 1766095, at *3 (N.D. Tex. Jun. 23, 2009) ("the Fifth Circuit has declined to presume the existence of irreparable harm" in Lanham Act trademark infringement actions).

to use.  (*See, e.g.*, Compl., Ex. 9, Docket No. 4-2 (listing filing basis as "1B"); Trademark Manual

of Examining Procedure § 1101 (7th ed.) (applicants "may file an application based on a bona fide

intention to use a mark in commerce" under section 1(b) of Trademark Act).  The record indicates

that plaintiff became aware of defendants' distribution of POLAR SHOCK products in November

2010 when Mr. Crowley discovered the "tweet" from Agganis Arena.  (Crowley Decl. ¶ 6).  Even

at the time it filed this motion for preliminary injunction, plaintiff still believed that extensive

distribution of the POLAR SHOCK products had not begun.  (Pl. Br. at 13).  The record does not

support an inference that plaintiff filed this motion to avoid legitimate commercial competition

after deciding there was no likelihood of consumer confusion.  The presumption of irreparable

harm applies, and this factor weighs in favor of granting an injunction.


C.      **Balance of Harms**

Defendant contends that it would incur $1 million in rebranding costs, and may lose

substantial sales, if this Court issues a preliminary injunction.  Rebranding costs should be

balanced against the harm to plaintiff if an injunction does not issue.  *See Unleashed Doggie Day*

*Care*, 2010 WL 5207599, at *8 (considering the defendant's rebranding costs in the balance of

hardships analysis).  In assessing the harms resulting from granting or denying a preliminary

injunction in a trademark infringement case, however, it is generally true that the harm to the

defendant flowing from an injunction where infringement appears likely is entitled to less

consideration than other harms.  *FDIC v. Elio*, 39 F.3d 1239, 1248 (1st Cir. 1994) (where the

likelihood of plaintiff's success on the merits is great, "less weight is to be given to the

defendant's prospective loss"); *Fritz*, 944 F. Supp. at 97-98 (courts should balance potential legitimate harm to the defendant against the plaintiff's likelihood of success on the merits).

Because the strength of plaintiff's marks varies geographically, so does the balance of harms.  In New England and New York, where the marks are strongest, plaintiff's loss of control over the value of its marks and loss of distinctiveness of those marks would be most acute. Similarly, because 92% of defendants' machines are installed outside New England and New York, enjoining their use of the POLAR SHOCK marks only in those areas reduces the overall harm to them.  (*See* Harter Supp. Decl. ¶ 1 (approximately 8% of POLAR SHOCK machines are located in New England and New York)).  The Court accordingly finds that in New England and New York, the likely harm to the plaintiff outweighs the harm to defendants arising from their inability to use the POLAR SHOCK marks, but that the balance of equities requires the opposite result in the remaining states.

### D.    <u>Public Interest</u>

"[A]s a matter of policy, trademarks should be protected against infringing uses." *Borinquen Biscuit*, 443 F.3d at 115.  Thus, in trademark cases, the public interest almost always favors granting otherwise appropriate injunctions.  *Fritz*, 944 F. Supp. at 97 (citing *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988)).  Plaintiff has demonstrated a likelihood of consumer confusion, and that showing "is enough to place the weight of public interest concerns in favor of granting the injunction."  *Boustany v. Boston Dental Grp., Inc.*, 42 F. Supp. 2d 100, 113 (D. Mass. 1999).

### E.    <u>Amount of Bond</u>

As noted, defendants have estimated that rebranding of its products would cost $1 million, and that it may lose substantial sales as a result.  An injunction limited to New England and New York, however, might result in substantially less expense, and therefore less harm to defendants if the injunction were found to have been wrongfully issued.  In the absence of any more meaningful evidence to assess the issue, the Court will require plaintiff to post a bond in the amount of $250,000, without prejudice to the ability of either party to seek to modify the amount in a future proceeding.

**III.**     <u>**Conclusion**</u>

For the foregoing reasons, plaintiff's motion for a preliminary injunction is GRANTED. Defendants PepsiCo, Inc. and The Concentrate Manufacturing Company of Ireland are hereby preliminarily restrained and enjoined as follows:

1.       For the purposes of this Preliminary Injunction Order, the following definitions shall apply:

      a.       "Defendants" shall mean PepsiCo, Inc. and The Concentrate Manufacturing Company of Ireland.

      b.       The "Challenged Marks" shall mean the following marks:

      POLARSHOCK, POLAR SHOCK SERIOUS STRAWBERRY, POLAR SHOCK RAZZBERRY, POLAR SHOCK,  POLAR SHOCK ORANGE FROST, POLAR SHOCK POTENT PEACH, POLAR SHOCK VIVA MARGARITA, POLAR SHOCK CHILLA VANILLA, POLAR SHOCK MO MOCHA, and POLAR SHOCK and Design.

     c.      The "Market" shall mean the states of Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, and New York.

     d.      "Advertisement" shall mean any advertisement, flyer, brochure, billboard, display, television commercial, radio commercial, Internet commercial, or similar communication of marketing, advertising, sale, or promotional information or materials directed to the general public or segments of the general public.

2.     Subject to paragraph 6 below, Defendants shall not use or display the Challenged Marks in the Market in connection with the promotion, sale, or distribution of frozen, flavored beverages.

3.     Subject to paragraph 6 below, Defendants shall not use or display any confusingly similar marks in the Market in connection with the promotion, sale, or distribution of frozen, flavored beverages.

4.     Subject to paragraph 6 below, Defendants shall not use or display the Challenged Marks in any Advertisement that will be or is intended to be circulated, displayed, or broadcast in the Market.

5.     This Order is binding upon Defendants and their agents, servants, and employees, and upon all persons in active concert or participation with them who receive actual notice of the Order by personal service or otherwise.

6.     In order to provide for an orderly transition, and to ensure that any applicable health and food safety requirements are observed, Defendants shall have 21 days from the date of this Order in which to undertake, in good faith, appropriate and

necessary actions to wind down and cease selling products using or displaying the Challenged Marks in the Market.

7.    This Order shall take effect upon the posting of a bond as set forth below, and shall remain in effect until the conclusion of the trial of this matter; provided, however, that it may be dissolved or modified upon appropriate motion and a showing of good cause to this Court.

8.    Plaintiff shall post a bond in the amount of $250,000 as soon as reasonably practicable after entry of this Order, but in any event no later than one week from the date of this Order.

**So Ordered.**

      /s/ F. Dennis Saylor         
F. Dennis Saylor IV
United States District Judge

Dated: April 28, 2011